**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**97 LEASING, LLC, ET AL.,**

**Plaintiffs,**

**- against -**

**MICHAEL FERUCCI REPAIR, INC.,**

**Defendant.**

**24-cv-52 (JGK)**

**Memorandum Opinion and Order**

**John G. Koeltl, District Judge:**

This case concerns a transaction involving the sale of snow removal equipment. Plaintiffs 97 Leasing, LLC ("97 Leasing") and Anglin Civil, LLC ("Anglin Civil") allege that defendant Michael Ferrucci Repair, Inc. ("MFR") breached a contract (the "Purchase Agreement") to sell certain pieces of snow removal equipment to 97 Leasing by failing to supply the goods identified in that agreement. The plaintiffs also allege that MFR defrauded 97 Leasing and Anglin Civil by materially misrepresenting the nature of the goods that it ultimately supplied to 97 Leasing pursuant to the Purchase Agreement. Pursuant to Federal Rule of Civil Procedure 56, the plaintiffs move for summary judgment granting their claims for breach of contract and fraud, and MFR moves for summary judgment dismissing each of those claims. See Def,'s Mem. of Law in Support of Mot. Summ. J., ECF No. 90 ("Def.'s Mot."); Pl.'s Mem. of Law in Support of Mot. Summ. J., ECF No. 99 ("Pl.'s Mot."). For the reasons that follow, the plaintiffs' motion is **denied** and MFR's motion is **granted in part and denied in part**.

## I.

The following facts are taken from the parties' Local Rule 56.1 statements, counterstatements, and supporting papers and are undisputed unless otherwise noted.

### A.

97 Leasing and Anglin Civil are participants in the market for snow removal services. Pl.'s Local Rule 56.1 Statement ("Pl.'s 56.1") ¶¶ 1–2, ECF No. 100. MFR previously provided similar snow removal services during the period between its incorporation in 1981 and the end of the 2021-22 snow season. Def.'s Local Rule 56.1 Statement ("Def.'s 56.1") ¶ 3, ECF No, 91. Following the death of MFR's long-time owner Michael Ferrucci in 2018, his family has gradually wound down MFR's business, including by liquidating its assets. Pl.'s 56.1 ¶¶ 5–6, 8.

In December 2022, the plaintiffs' principal Douglas Anglin ("Anglin") indicated that he was interested in purchasing multiple snow melters from MFR. Def.'s 56.1 ¶¶ 11, 34. Anglin's outreach was undertaken in connection with a request for proposals issued by the Denver International Airport for a five-year snow removal contract for which the plaintiffs sought to submit a bid. Def.'s 56.1 ¶¶ 40–41, 44. MFR alleges that during December 2022, Anglin inspected three specific snow melters with the capacity to melt 350 tons of snow per hour (the "350-TPH Melters"). Def.'s 56.1 ¶¶ 34–35. MFR also alleges that during this initial inspection, MFR informed Anglin that the 350-TPH Melters had been assembled by MFR pursuant to a license agreement

with Trecan Combustion Limited ("Trecan"), a large manufacturer of snow melters.[1] Id. Anglin reportedly acknowledged this statement, responding that he "needed to get one of those." Id. The plaintiffs dispute that this inspection ever took place, that anyone at MFR ever made this representation to Anglin, and that MFR's licensing agreement with Trecan was ever disclosed to the plaintiffs prior to their transaction with MFR.

Anglin's discussions with MFR continued into January 2023, when he again inquired into MFR's supply of snow melters. Pl.'s 56.1 ¶ 4. In the course of this outreach, Anglin specifically noted that he was interested in leasing or purchasing three "Trecan 350" and three "Trecan 150." Id.; Email Correspondence Dated Jan. 3, 2023, Ex. A to Serra Decl., ECF No. 102-1 at 1. Later that month, the defendant's owner Rosemary Ferrucci responded by offering to sell Anglin each of the six snow melters in which he had expressed interest, writing: "[a]t this time, we could offer you the 6 requested melters { *(Q:3) Trecan 150 ton and (Q:3) Trecan 350 ton* } for a total price of five million dollars." Pl.'s 56.1 ¶¶ 6–7; Email Correspondence Dated Jan. 13, 2023, Ex. B to Serra Decl., ECF No. 102-2 (emphasis in original).[2] The parties do not dispute that "350" and "150," as used in this context, refer to the tonnage of

1 According to MFR, in 2006, it entered into a licensing agreement with Trecan for the right to assemble snow melters using Trecan's "components, technology, and name" in exchange for certain royalties and other fees. Def.'s 56.1 ¶¶ 13–18. The plaintiffs dispute these facts on the basis that MFR has allegedly failed to produce a fully executed licensing agreement in this proceeding. Pl.'s Counterstatement to Def.'s Local Rule 56.1 Statement, ECF No. 111 ¶¶ 13–18.

2 Unless otherwise noted, this Opinion and Order omits all internal alterations, citations, footnotes, and quotations in quoted text.

snow that a given piece of equipment is capable of melting in one hour. See e.g., Def.'s 56.1 ¶ 12. The parties also do not dispute that "Trecan," as used in this series of communications, refers to Trecan Combustion Limited. Def.'s 56.1 ¶ 13. However, the parties disagree as to the specific meaning of "Trecan" as that descriptor was applied in the course of this preliminary correspondence. The plaintiffs contend that designating a particular snow melter as "Trecan" in this context expressly indicated that those snow melters had been manufactured by Trecan. Pl.'s 56.1 ¶ 6. MFR disputes this contention, and counters that throughout the course of its dealings with the plaintiffs, the designation of certain snow melters as "Trecan" merely reflected their "make," that is, their manner or style of construction—and accordingly applies to snow melters manufactured by Trecan as well as snow melters manufactured by MFR using Trecan components. Def.'s 56.1 ¶ 168.

Anglin did not acknowledge Rosemary Ferrucci's response until March 25, 2023, when he replied to that email, asking to "sit down and hash out the details on the melters as discussed." Def.'s 56.1 ¶¶ 48, 51; Email Correspondence Dated Mar. 30, 2023, Ex. 29 to Berman Decl., ECF No. 96-29 ("March Correspondence") at 4. On March 30, 2023, following a March 29 videoconference between Anglin and MFR, Rosemary Ferruccci made an updated offer to Anglin by email. Def.'s 56.1 ¶ 52; March Correspondence at 1. Under the terms of the updated offer, MFR offered to sell the plaintiffs the 350-TPH Melters and the three 150-ton-per-hour melters that Rosemary Ferrucci and Anglin had discussed in January, as well as seven smaller snow melters with

between twenty and sixty ton-per-hour capacity and a set of blades, for a purchase price of $5 million. Def.'s 56.1 ¶ 54; March Correspondence at 1.

On April 4, 2023, Anglin traveled to New York to inspect the snow melters identified in MFR's March 30, 2023 offer. Def.'s 56.1 ¶ 55. This inspection lasted approximately two hours. Def.'s 56.1 ¶ 60. During his April 4, 2023 visit, Anglin closely inspected the 350-TPH Melters, including by "climb[ing]" into the machines and entering their electrical and mechanical rooms. Def.'s 56.1 ¶ 63. The parties do not dispute that the 350-TPH Melters bore plates identifying them as having been manufactured by non-Trecan entities. Def.'s 56.1 ¶¶ 66–67. Specifically, one of the 350-TPH Melters featured a plate on its trailer reading "Manufactured by International Trailers Inc.," and the other two each featured plates on each of their trailers reading "MFG by/Fabrique par: Benson Int'l." Id. Anglin has represented that he did not see these plates because his view was obstructed by other snow melters. Def.'s 56.1 ¶ 66. These same snow melters also exhibited multiple observable differences from analogous Trecan-manufactured equipment, including the type of door used to enter each snow melter, as well as the material used for engine enclosures. Def.'s 56.1 ¶¶ 71–76.

In an email that Anglin sent to Rosemary Ferrucci the following day, he confirmed that he had "a chance to take a look at everything." Def.'s 56.1 ¶ 78; Email Correspondence Dated Apr. 5, 2023, Ex. 41 to Berman Decl., ECF No. 96-41 ("April Correspondence") at 2. In that April 5 email, Anglin expressed uncertainty as to whether he remained interested in purchasing the

350-TPH Melters, noting concerns over the measure of time and resources required to make necessary repairs to those pieces of equipment. Def.'s 56.1 ¶ 78; see also April Correspondence at 2. In light of those concerns, Anglin inquired as to whether MFR would be willing to sell him a subset of the snow melters identified in MFR's March 30, 2023 offer, excluding the 350-TPH Melters. Def.'s 56.1 ¶ 78; see also April Correspondence at 2. On April 10, 2023, Rosemary Ferrucci followed up with Anglin by email regarding MFR's March 30, 2023 offer, asking him to indicate whether he planned to move forward with the contemplated transaction. Def.'s 56.1 ¶ 84; Email Correspondence Dated Apr. 14, 2023, Ex. 26 to Berman Decl., ECF No. 96-26 at 6–7. Anglin replied the same day, reiterating his interest in purchasing only a subset of the equipment encompassed by that offer. Def.'s 56.1 ¶ 85. In response, Rosemary Ferrucci explained that MFR would prefer to sell the more robust set of equipment identified in her March 30, 2023 email as a "package deal," but that MFR "remain[ed] open to options." Def.'s 56.1 ¶ 86. Later that day, Anglin offered to purchase the entire portfolio described in the March 30, 2023 email for a purchase price of $3.5 million. Def.'s 56.1 ¶ 88. In turn, MFR lowered its asking price to $4.25 million, and on April 13, 2023, Anglin accepted this counteroffer. Def.'s 56.1 ¶ 92.

As the parties' negotiations progressed, the plaintiffs tracked their contemplated purchases internally, including through a pair of spreadsheets prepared by their shared Director of Operations, Brad Greff ("Greff"). Def.'s 56.1 ¶¶ 82, 104-06. The first of these charts was transmitted by Greff to

Anglin on April 7, 2023, and the second chart was transmitted by Greff to Anglin on April 13, 2023. Id. Each chart contained a brief list of equipment that the plaintiffs were considering purchasing at the time of their transmittal, and each list included the 350-TPH Melters. Def.'s 56.1 ¶ 111; see also Greff Email Dated Apr. 7, 2023 and Attached Chart, Ex. 44 to Berman Decl., ECF No. 96-44 ("Chart I"), Greff Email Dated Apr. 13, 2023 and Attached Chart, Ex. 48 to Berman Decl., ECF No. 96-48 ("Chart II"). In the first chart, each enumerated piece of equipment was listed alongside "a manufacturer's brand name"; the name associated with each of the 350-TPH Melters was "Trecan." Def.'s 56.1 ¶ 111; see also Chart I. The second chart retained the same format, but omitted the manufacturer's brand name for the 350-TPH Melters. Def.'s 56.1 ¶ 111; see also Chart II. In both charts, the value for each of the 350-TPH Melters was listed as $500,000. See Chart I; Chart II.

**B.**

On April 14, 2023, MFR sent Anglin a draft purchase agreement that contained the Vehicle Identification Numbers ("VINs") for the equipment that the plaintiffs sought to purchase. Def.'s 56.1 ¶ 113. On April 25, 2023, Rosemary Ferrucci and Anglin executed the Purchase Agreement on behalf of MFR and 97 Leasing, respectively. Def.'s 56.1 ¶ 164; Purchase Agreement, Ex. 43 to Berman Decl., ECF No. 106-43 ("Purchase Agreement") at 4. The goods to be purchased by 97 Leasing were enumerated and described in a large table featured prominently on the first page of the Purchase

Agreement, including the 350-TPH Melters in the first three substantive rows of the chart:

MELTER UNITS

| UNIT # | YEAR | CA-PACI TY | MODEL/MAKE | SERIAL # | CONDI-TION |
|---|---|---|---|---|---|
| 43134 | 2006 | 350 | MFR / TRECAN | 1Z9UC4828XM048267 | AS-IS WHERE IS |
| 43135 | 2006 | 350 | MFR / TRECAN | 5DMFDSXC47B000247 | AS-IS WHERE IS |
| 43136 | 2006 | 350 | MFR / TRECAN | 5DMFDSXC67B000248 | AS-IS WHERE IS |
| 43137 | 2004 | 40 | TRECAN | 2T9TH637440159032 | AS-IS WHERE IS |
| 43138 | 2004 | 40 | TRECAN | 693-1 | AS-IS WHERE IS |
| 43139 | 2004 | 40 | TRECAN | 693-3 | AS-IS WHERE IS |
| 43147 | 1999 | 60 | TRECAN | PD SNOWMELTER 2089 | AS-IS WHERE IS |
| 43148 | 2005 | 20 | TRECAN | 2T9TH43T950159047 | AS-IS WHERE IS |
| 43153 | 2009 | 150 | TRECAN | 2T9TFWA5190159099 | AS-IS WHERE IS |
| 43154 | 2009 | 150 | TRECAN | 2T9TFWA5490159114 | AS-IS WHERE IS |

| | | | | | |
|---|---|---|---|---|---|
| 43155 | 2009 | 150 | TRECAN | 2T9TFWA5390159105 | AS-IS WHERE IS |
| 43157 | 1997 | 60 | TRECAN | 2018 | AS-IS WHERE IS |
| 43158 | 2001 | 60 | TRECAN | 2A9THA4E110050035 | AS-IS WHERE IS |

ATTACHMENT EQUIPMENT

| Quantity | Size | Description | CONDITION |
|---|---|---|---|
| 17 | 28' — 32' (Varying Sizes) | Large Blade | AS-IS WHERE IS |

Id. The Purchase Agreement further provided:

> AS-IS: These items are sold in "AS-IS" and "WHERE-IS" condition. All Sales Final. Seller makes no warranty, guarantee or representation of any kind, express or implied, as to the merchantability or fitness for any purpose of the property/vehicles for sale.

Id. at 3. The Purchase Agreement does not define any term as "MFR," and provides only "Seller" and "Ferrucci" as defined terms referring to the defendant. Pl.'s 56.1 ¶ 10; Purchase Agreement. The Purchase Agreement also does not provide any definition of "TRECAN." See generally Purchase Agreement. MFR explains that MFR designated the 350-TPH Melters' model and make as "MFR / TRECAN" because they were each assembled by MFR using "Trecan components." Def.'s 56.1 ¶ 168. However, in his review of the Purchase Agreement, Anglin claims that he interpreted "MFR" as an abbreviation for "manufacturer." Def.'s 56.1 ¶ 173. Anglin conceded that this reading of "MFR" was based on his own personal knowledge, and that no

member of the Ferrucci family ever informed him that "MFR" is an abbreviation of "manufacturer." Def.'s 56.1 ¶¶ 118, 173.[3] Anglin also did not ask any member of the Ferrucci family to clarify the meaning of the language provided in the "MODEL/MAKE" column. Def.'s 56.1 ¶¶ 117.

On April 26, 97 Leasing transferred $250,000 to MFR as a down payment in connection with the Purchase Agreement. Pl.'s 56.1 ¶ 9; Wire Confirmation Dated Apr. 26, 2023, Ex. D to Serra Decl., ECF No. 102-4. Following the execution of the Purchase Agreement, MFR issued two invoices to 97 Leasing, each dated May 1, 2023. Pl.'s 56.1 ¶¶ 12–13; May 1, 2023 Invoice, Ex. F to Serra Decl., ECF No. 102-6 at 1; Further May 1, 2023 Invoice, Ex. G to Serra Decl., ECF No. 102-7 at 1. Both of these invoices identified each of the 350-TPH Melters as a "2006 TRECAN 350 TON MELTER," without designating any of these snow melters as an "MFR" snow melter. Id. The abbreviation "MFR" does not appear in either document, except where it appears in the URL for MFR's website, "www.mfrinc.com." Id. MFR alleges that each of the 350-TPH Melters was characterized in these invoices as a "2006 TRECAN 350 TON MELTER" because the invoices were prepared using the accounting software QuickBooks, that "pre-populated the information for the

[3] After the death of MFR's founder Michael Ferrucci, certain members of his family have played a role in the operations of MFR. See e.g., Def.'s 56.1 ¶¶ 6 (explaining that following Michael Ferrucci's death, "the owner of MFR became Michael Ferrucci's wife, Rosemary Ferrucci"); 34 (noting the involvement of Joseph Ferrucci in MFR's operations), 113 (noting the involvement of Andrea Ferrucci in MFR's operations).

invoice using the information from a prior snow melter sale." Def.'s Counter-statement to Pl.'s 56.1, ECF No. 108 ¶ 12.

During April and May 2023, the plaintiffs conducted additional due diligence with respect to the 350-TPH Melters. The plaintiffs do not dispute that as of April 14, 2023, Anglin possessed the information necessary to verify the manufacturer of the 350-ton-per-hour snow melters directly with Trecan. Def.'s 56.1 ¶ 133. The plaintiffs did not pursue the confirmation of this information with Trecan until after they had made the final payment to MFR required by the Purchase Agreement on May 11, 2023. Def.'s 56.1 ¶¶ 136, 177-78. Anglin explained during his deposition that he refrained from confirming this information with Trecan out of a concern that doing so would hamper the plaintiffs' odds of obtaining a sought-after snow removal contract with Denver International Airport. June 17, 2025 Dep. of Lowell Douglas Anglin II, Ex. 3 to Berman Decl., ECF No. 96-3 at 98:11–101:21. In Anglin's view, disclosing this sort of information to a large firm in the snow removal industry could have resulted in "word [getting] out" about their strategy, weakening the plaintiffs' competitive position. Id.

The plaintiffs' due diligence in connection with the Purchase Agreement was limited to communications with MFR and in-person physical inspection of the equipment, as well as third-party diligence conducted by Oxford Bank, the plaintiffs' lender for this transaction. Def.'s 56.1 ¶ 138. Oxford Bank's due diligence, in turn, consisted of hiring a third-party appraiser, Kevin Miller ("Miller"), and reviewing Miller's report on the equipment sold

pursuant to the Purchase Agreement. Def.'s 56.1 ¶ 139. Miller did not pursue any confirmation of the equipment's manufacturer, but did conduct a thorough in-person inspection of the equipment. Def.'s 56.1 ¶ 142–55. The plaintiffs assert, and MFR denies, that during Miller's May 2023 inspection, he asked MFR about the manufacturer of the 350-TPH Melters, and Joseph Ferrucci represented to him that they had been manufactured by Trecan. Pl.'s 56.1 ¶ 16; May 14, 2025 Dep. of Kevin Miller, Ex. H to Serra Decl., ECF No. 102-8 at 119:17–120:22. Although the 350-TPH Melters were ultimately tendered in used condition, and required meaningful repairs, the plaintiffs were aware of these issues prior to executing the Purchase Agreement. Def.'s 56.1 ¶ 59, 88, 164. On May 11, 2023, following the conclusion of due diligence, the plaintiffs' bank wired the remaining funds owed to MFR pursuant to the Purchase Agreement. Def.'s 56.1 ¶¶ 163, 178.

In May 2023, following 97 Leasing's final payment to MFR, the plaintiffs contacted Trecan with a question concerning spare parts for the 350-TPH Melters. Def.'s 56.1 ¶ 182; Pl.'s 56.1 ¶ 18. In the course of the ensuing correspondence, Trecan informed an employee of Anglin Civil that it had not manufactured the three 350-TPH Melters, and instead, had supplied components for the assembly of those snow melters, that were designed and built by MFR without Trecan's input. Def.'s 56.1 ¶ 186; Pl.'s 56.1 ¶ 18; Email Correspondence, Dated Jun 8, 2023, Ex. 56 to Berman Decl., ECF No. 96-56 at 3. Approximately one week later on June 2, 2023, Anglin emailed MFR regarding the manufacturer of the 350-TPH Melters. Def.'s 56.1 ¶ 202; Pl.'s 56.1 ¶

19. In this email, Anglin asserted that "[he] was clearly sold Trecan Units per the [Purchase Agreement]," and that MFR's alleged misrepresentations regarding the 350-TPH Melters' manufacturer constituted "fraud." Email Correspondence, Dated Jun 2, 2023, Ex. 59 to Berman Decl., ECF No. 96-59. Andrea Ferrucci responded the following day, disclaiming responsibility for the plaintiffs' misapprehension, and explaining that the 350-TPH Melters had been assembled by MFR pursuant to a licensing agreement between MFR and Trecan. Email Correspondence Dated June 8, 2023, Ex. K to Serra Decl., ECF No. 102-11 at 3-4. On June 7, 2023, Anglin responded. Id. at 2–3. Citing New York Uniform Commercial Code ("N.Y. U.C.C.") Law § 2-602, he rejected the 350-TPH Melters as nonconforming goods, requesting that MFR return the funds paid for them and indicating that he planned to return the snow melters promptly. Id. In response, Rosemary Ferrucci asserted that MFR had adequately performed under the Purchase Agreement, and declined to return the funds that 97 Leasing had paid for the 350-TPH Melters. Id. at 1–2. Upon learning that the 350-TPH Melters had not been manufactured by Trecan, Miller revisited his valuation, and assigned a lower value to each of the 350-TPH Melters. Def.'s 56.1 ¶¶ 156, 206; Pl.'s 56.1 ¶ 24. The amount by which Miller reduced his original valuation is disputed by the parties: while MFR contends that Miller reduced his valuation from $925,000 to $550,000 per 35-TPH Melter, the plaintiffs dispute those amounts, and assert that Miller "revised [his] valuation to reflect the reduced value of the units" without reference to any specific dollar figures. Id.

**C.**

On January 4, 2024, the plaintiffs filed this action, asserting claims for violations of New York consumer protection law under New York General Business Law §§ 349 and 350, breaches of express and implied warranty, negligent misrepresentation, fraud, unjust enrichment, and breach of contract. Complaint, ECF No. 1 ¶¶ 28–74. In an amended complaint filed on April 16, 2024, the plaintiffs reasserted each of these claims except for breach of warranty. Amended Complaint, ECF No. 20 ("Am. Compl.") ¶¶ 36–109. On May 2, 2024, MFR moved to dismiss each of the plaintiffs' claims. Def.'s Mot. to Dismiss, ECF No. 21. The Court granted that motion in part, and denied it in part, dismissing the plaintiffs' claims for violations of New York General Business Law §§ 349 and 350, negligent misrepresentations, and unjust enrichment, and declining to dismiss their claims for fraud and breach of contract. Tr. of Oral Arg. dated Jan. 29, 2025, ECF No. 43 at 25:14–16, 27:16–18, 30:16–17, 31:25–32:2, 32:25–33:2. On October 3, 2025, MFR moved for summary judgment dismissing each of the plaintiffs' remaining claims, and the plaintiffs cross-moved for summary judgment granting summary judgment on the same claims. Def.'s Mot. at 1; Pl.'s Mot. at 1.

**II.**

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am., 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the burden shifts to the non-moving party to bring forward "specific facts showing a genuine issue for

trial." Ovesen v. Mitsubishi Heavy Indus, of Am., Inc., No. 04cv2849, 2012 WL 677953, at *1 (S.D.N.Y. Mar. 1, 2012). The non-moving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jinq Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); Ovesen, 2012 WL 677953, at *1. If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law. See Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

All parties agree that the claims in this case are governed by New York law, and the Court can accept that agreement. See Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 152 (2d Cir. 2016) ("In a diversity case such as this one, the choice-of-law rules of New York, the forum state, govern.... Under New York choice-of-law rules, where the parties agree that a certain jurisdiction's law controls, this is sufficient to establish choice of law.").

**III.**

MFR moves for summary judgment dismissing the plaintiffs' claims for breach of contract and fraud, and the plaintiffs move to grant summary judgment in favor of those claims.

**A.**

For the plaintiffs to obtain summary judgment against MFR on their breach of contract claim, they must show: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."

Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011). While MFR disputes neither the existence of a valid agreement nor adequate performance by 97 Leasing under the Purchase Agreement, MFR does dispute that it breached the Purchase Agreement, and that the plaintiffs suffered any damages. Def.'s Mot. at 13–16.

Under New York law, "[t]o determine the terms of a contract a court must ascertain the parties' intent based on the language they used." Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993). "When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).

Whether a contract's terms are ambiguous is a question of law for the court. Law Debenture Tr. Co. of N. Y. v. Maverick Tube Corp., 595 F.3d 458, 465–66 (2d Cir. 2010) (collecting cases). Contract terms are unambiguous where they provide "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Seiden, 959 F.2d at 428. Where, on the other hand, contract terms are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally

understood in the particular trade or business," the contract terms are ambiguous. Id.

The plaintiffs argue that MFR was required to tender three Trecan-manufactured snow melters with 350-ton-per hour capacity because MFR had led the plaintiffs to believe that the 350-TPH Melters designated in the Purchase Agreement were manufactured by Trecan. Pl.'s Mot. at 24–25. In so arguing, the plaintiffs rely on the Purchase Agreement's designation of the 350-TPH Melters' make and model as "MFR / TRECAN." Pl.'s Mot. at 25. MFR, in contrast, casts the plaintiffs' impression that the 350-TPH Melters were manufactured by Trecan as a unilateral mistake by plaintiffs. Def.'s Mot. at 15–16. MFR contends that the Purchase Agreement's "MFR / TRECAN" designation indicated that the 350-TPH Melters had been manufactured using "Trecan components," but assembled by MFR. Def.'s Mot. at 15–16. Accordingly, MFR argues, it was under no obligation to tender any Trecan-manufactured snow melters with the capacity to melt 350 tons of snow per hour, and it performed adequately under the Purchase Agreement by delivering the three 350-TPH Melters designated in the Purchase Agreement.[4] Id. at 13–15.

---

[4] Although the plaintiffs contend that MFR breached the Purchase Agreement with respect to the 350-TPH Melters, they do not allege that MFR breached the Purchase Agreement with respect to any of the other equipment sold pursuant to that agreement. See Pl.'s Mot. at 24–30; Am. Compl. ¶¶ 84–109. Instead, the scope of MFR's alleged breach is confined entirely to the delivery of the alleged 350-TPH Melters. Id.

Looking to the plain terms of the Purchase Agreement, there can be no dispute that MFR has adequately performed its obligations under the contract. The snow melters encompassed by the Purchase Agreement were each identified by a specific VIN, and each of the 350-TPH Melters was personally and closely inspected by Anglin prior to the plaintiffs' purchase. The plaintiffs have never contended that the individual snow melters specified by VIN in the Purchase Agreement were distinct from those ultimately delivered to 97 Leasing. Although the 350-TPH Melters were sold and delivered in used condition, the plaintiffs were aware of this fact and understood that those machines would require meaningful repairs prior to their use. What is more, each of the 350-TPH Melters was sold pursuant to an "AS-IS" and "WHERE-IS" provision, under which MFR "ma[de] no warranty, guarantee or representation of any kind, express or implied, as to [their] merchantability or fitness for any purpose." See Purchase Agreement at 1, 3. In sum, the Purchase Agreement unambiguously required that MFR deliver three specific snow melters with 350-ton-per-hour capacity as identified by VIN, and there is no dispute that MFR ultimately did so.

In support of their breach of contract theory, the plaintiffs rely on the Purchase Agreement's designation of the 350-TPH Melters' model and make as "MFR / TRECAN," but do not identify any other portion of that agreement giving rise to an obligation to provide Trecan-manufactured snow melters with 350-ton-per-hour capacity. Am. Compl. ¶ 89; Pl.'s Mot. at 24–25. This unspecified reference to the Trecan brand, however, lacks the clarity and

specificity required to impose such an obligation on MFR. Nowhere does the Purchase Agreement establish any requirement or make any representation as to the manufacturer of any equipment. See Purchase Agreement. Nor does it contain any assurance to the effect that any of the equipment described therein was "authentically manufactured by Trecan," as the plaintiffs suggest was required by the Purchase Agreement. Id.; Am. Compl. ¶ 87.

The parties dispute the meaning of "MFR / TRECAN" on the Purchase Agreement. The plaintiffs allege that this was a representation that the three machines at issue were manufactured by Trecan. But this argument is unpersuasive because only those three machines had that description and the other machines that were manufactured by Trecan were designated simply as "TRECAN." The addition of MFR suggests a difference. The defendant argues that "MFR" referred to "Michael Ferrucci Repair" and this designation signified a difference from the other machines that were manufactured solely by Trecan. Ultimately, this dispute makes no difference because it is plain that the three machines designated by their VINs were the three machines that the plaintiffs inspected and that the defendant delivered.

The plaintiffs seek to buttress their core breach of contract theory with a parallel argument that MFR violated N.Y. U.C.C. §§ 2-601 and 2-608 by failing to tender conforming snow melters. Pl.'s Mot. at 24–30. This reframing fares no better. Pursuant to N.Y. U.C.C. § 2-601, the purchaser of goods that fail to conform to the terms of the contract under which they were purchased may, upon tender, reject those goods. N.Y. U.C.C. § 2-608 provides, in turn,

that a buyer who has accepted the tender of goods may revoke that acceptance if it accepted the goods: “(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or (b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.” Relying on these provisions, the plaintiffs contend that they timely rejected the 350-TPH Melters, and that they were entitled to do so because the 350-TPH Melters were not manufactured by Trecan (and as such, constituted nonconforming goods within the meaning of those provisions). Pl.’s Mot. at 27–30. However, the statutory provisions on which the plaintiffs rely do not permit the rejection of goods for failure to satisfy conditions that the seller never affirmatively represented its tender would meet. See Patitucci v. Consumers Warehouse Ctr., Inc., 851 N.Y.S.2d 72, at *1 (Sup. Ct. 2007). Accordingly, this argument fails for the same reasons as the plaintiffs’ common-law breach of contract argument: the Purchase Agreement did not require MFR to tender any Trecan-manufactured snow melters with 350-ton-per-hour capacity.

Because MFR has demonstrated that it performed under the terms of the Purchase Agreement, MFR’s motion for summary judgment dismissing the plaintiff’s breach of contract claim is **granted**, and the plaintiffs’ motion for summary judgment dismissing that claim is **denied.**

**B.**

The parties also cross-move for summary judgment on the plaintiffs' fraud claim. To state a claim for common law fraud under New York law, "a plaintiff must allege (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Haggerty v. Ciarelli & Dempsey, 374 F. App'x 92, 94 (2d Cir. 2010). Each of these elements "must be proven by clear and convincing evidence." Harding v. Naseman, 377 F. App'x 48, 49 (2d Cir. 2010). Under New York law, "[c]lear and convincing evidence is evidence that satisfies the factfinder that it is highly probable that what is claimed actually happened and it is evidence that is neither equivocal nor open to opposing presumptions." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 13 F.4th 247, 260 (2d Cir. 2021).

On their motion for summary judgment, the plaintiffs argue that MFR materially misrepresented that the 350-TPH Melters had been manufactured by Trecan. Pl.'s Mot. at 11–13. The plaintiffs premise their claim for fraud on three statements made to them by MFR: (1) MFR's January 2, 2023 email characterizing the 350-TPH Melters as "Trecan 350 ton" melters; (2) the characterization of the 350-TPH Melters' model and make as "MFR / Trecan" in the Purchase Agreement; and (3) the May 1, 2023 invoices issued by MFR, in which each 350-TPH Melter was characterized as a "2006 Trecan 350 Ton Melter." Pl.'s Mot. at 12–13. The plaintiffs contend that MFR made those

statements intentionally to mislead them as to the manufacturer of the 350-TPH Melters, and that they justifiably relied on those representations in agreeing to purchase those machines. Pl.'s Mot. at 15–17, 20–22. MFR denies that it intended to defraud the plaintiffs, and contends that the plaintiffs should have known that the 350-TPH Melters were not manufactured by Trecan or at least investigated whether the specific snow melters were manufactured by Trecan if it made a difference to them. Def.'s Mot. at 17–18.

Numerous disputes of material fact preclude a grant of the plaintiffs' motion for summary judgment with respect to their fraud claim. There are many disputed issues of material fact as to whether MFR acted with the requisite scienter. For example, MFR contends that in December 2022—at the very outset of its dealings with the plaintiffs—an agent of MFR personally informed Anglin that the 350-TPH Melters had been manufactured by MFR pursuant to a licensing agreement with Trecan, and that Anglin verbally acknowledged this representation. If true, this disputed fact would bar a finding that MFR intentionally or recklessly induced the plaintiffs to believe that the 350-TPH Melters had been manufactured by Trecan. Moreover, the plaintiffs' inspection of the 350-TPH Melters before entering into the Purchase Agreement supports the defendant's argument that the plaintiffs did not reasonably rely on any of the alleged misstatements. Further, the alleged misstatements do not clearly state that the 350-TPH Melters were manufactured by Trecan. First, MFR's January 2023 characterization of the 350-TPH Melters as "Trecan 350 ton [melters]," as well as their May 2023 description

of the same as "2006 Trecan 350 Ton Melter[s]" could reasonably be perceived as characterizing the equipment's overarching style or design, or reflecting the fact that they contain Trecan components. And as discussed above, it is not clear that the shorthand "MFR / TRECAN" as used in the Purchase Agreement betrays an intent by its drafter to represent falsely that the 350-TPH Melters were manufactured by Trecan. Indeed, MFR's proffered explanation of this shorthand (namely, that it identifies the 350-TPH Melters as having been manufactured by MFR with Trecan components) is at least plausible on its face.

Nor are the plaintiffs able to demonstrate their justifiable reliance as a matter of law. Issues of fact exist, for example, with respect to Anglin's inspection of the 350-TPH Melters, and whether the machines' facial visual differences from Trecan-manufactured melters put the plaintiffs on notice as to the identity of their manufacturer. While it is undisputed that Anglin inspected the 350-TPH Melters on at least one occasion, and that those machines differed in certain respects from analogous Trecan-manufactured snow melters, the parties dispute whether these distinctions indicated that these machines were not Trecan-manufactured to a sophisticated party. It is similarly unclear whether the plaintiffs reasonably relied on MFR's statements as representations that the 350-TPH Melters were manufactured by Trecan—particularly in light of MFR's disputed assertion that it informed the plaintiffs of the melters' manufacturer in December 2022. Moreover, there is at least some reason to believe that the plaintiffs suspected that Trecan did

not manufacture the 350-TPH Melters, but willfully blinded themselves to this possibility. For example, the plaintiffs circulated internal documents describing the 350-TPH Melters as "Trecan" during Anglin's negotiations with Rosemary Ferrucci, but ultimately removed the descriptor "Trecan" from their characterization of those machines prior to reaching an agreement with MFR. The same inference could reasonably be supported by the fact that the plaintiffs neither specifically inquired into the manufacturer of the 350-TPH Melters with MFR, nor sought to confirm with Trecan that the machines were manufactured by Trecan before entering into the Purchase Agreement.

On the other hand, many issues of material fact preclude granting MFR's motion for summary judgment dismissing the claim for fraud against it. There are numerous issues of fact concerning MFR's scienter in making various statements about the 350-TPH Melters. Although MFR never expressly represented that the 350-TPH Melters had been manufactured by Trecan, over the course of their dealings with Anglin, MFR repeatedly referred to those machines as "Trecan" snow melters. While MFR contends that it informed the plaintiffs of the 350-TPH Melters' provenance and of MFR's related licensing agreement with Trecan early in its discussions with Anglin, that fact is disputed: the plaintiffs contend that neither the 350-TPH Melters' manufacturer nor the existence of a licensing agreement between Trecan and MFR was disclosed to them prior to the execution of the Purchase Agreement. Further, in January 2023, Anglin clearly indicated that he was interested in purchasing "Trecan 350" snow melters in order to satisfy the requirements

for a pending request for proposals, plausibly suggesting to MFR that the Trecan brand was material to Anglin's interest in the 350-TPH Melters.

MFR continued to refer to the Trecan brand in describing the 350-TPH Melters following the execution of the Purchase Agreement and during due diligence. For example, MFR's May 1, 2023 invoice to 97 Leasing characterized each 350-TPH Melter as a "2006 Trecan 350 Melter." The plaintiffs also allege that MFR expressly represented to Miller that the 350-TPH Melters had been manufactured by Trecan. Although these events followed the plaintiffs' decision to purchase the 350-TPH Melters, they may nonetheless bear on scienter insofar as they could support the inference that MFR undertook a broader scheme to deceive the plaintiffs, and that scheme continued until its dealings with the plaintiffs had concluded. Thus, there are issues of fact as to whether MFR was aware of the plaintiffs' interest in purchasing Trecan-manufactured snow melters with 350-ton-per-hour capacity, and intentionally induced the plaintiffs to believe that the 350-TPH Melters met those specifications.

MFR also contends that it is entitled to summary judgment because the plaintiffs failed to conduct a reasonable investigation into the 350-TPH Melters' provenance, and in turn, cannot demonstrate justifiable reliance on MFR's statements. Def.'s Mot. at 18–19. MFR emphasizes that in advance of the closing, the plaintiffs were aware of the 350-TPH Melter's VINs, and that this enabled them to confirm promptly the manufacturer of those machines by contacting Trecan. Indeed, the plaintiffs did just that following the

conclusion of due diligence, and Trecan was able to confirm within two hours of the plaintiffs' initial outreach that Trecan had not manufactured the 350-TPH Melters. MFR also contends, and the plaintiffs dispute, that the facially discernible physical differences between the 350-TPH Melters and Trecan-manufactured melters were sufficiently significant to place the plaintiffs on notice that those machines may not have been manufactured by Trecan. Def.'s Mot. at 19. MFR also emphasizes Anglin's decision not to contact Trecan about the 350-TPH Melters due to concerns over obtaining the Denver International Airport contract, and suggests that this decision constitutes "willful blindness" or "conscious avoidance" on the part of the plaintiffs. Def.'s Mot. at 19.

Under New York law, "[r]easonable reliance entails a duty to investigate the legitimacy of an investment opportunity where plaintiff was placed on guard or practically faced with the facts." Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006). This inquiry is highly contextual, and is generally not susceptible to resolution as a matter of law. Schlaifer Nance & Co. v. Est. of Warhol, 119 F.3d 91, 98 (2d Cir. 1997) ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive."). While there is no dispute that Anglin is a sophisticated businessman with extensive experience in the market for snow removal equipment, this "determination nonetheless remains fact sensitive," because "[t]he existence of any expertise or sophistication is a circumstance considered by the factfinder when it decides the issue." Nat'l W. Life Ins. Co. v.

Merrill Lynch, Pierce, Fenner & Smith, Inc., 89 F. App'x 287, 292 (2d Cir. 2004). In this case, multiple disputed issues of fact pervade the sufficiency of the plaintiffs' investigation, including the obviousness of the differences between Trecan-manufactured snow melters and the 350-TPH Melters, whether Anglin's sophistication should have enabled him to observe those distinctions, and what reasonable due diligence would have entailed under the circumstances of the plaintiffs' purchase. Accordingly, the reasonableness of the plaintiffs' reliance cannot be resolved at this stage.

Finally, MFR also contends that it is entitled to summary judgment on the plaintiffs' fraud claim because the plaintiffs are unable to prove damages.[5] Def.'s Mot. at 20. However, neither party disputes that Miller materially discounted his valuation of each 350-TPH Melter upon learning that they had not been manufactured by Trecan, and did so specifically because they had been assembled by MFR rather than an established manufacturer like Trecan. Although MFR reasons that Miller's revised valuation ($550,000 per melter) is higher than the plaintiffs' internal pre-closing valuation ($500,000 per melter), and thus, that "the Plaintiffs *did not* over pay [sic] for the melters," Def.'s Mot. at 26, the difference between the plaintiffs' initial valuation and the 350-TPH Melters' true value is not dispositive of whether the plaintiffs suffered damages. Rather, as the Court articulated is resolving MFR's motion to dismiss, "any damages would amount to the

5 In its summary judgment motion, MFR argues that the expert testimony proffered by the plaintiffs is inadmissible. Def.'s Mot. at 21–26. It is unnecessary to resolve this issue on this motion.

difference between authentic Trecan units and the units the plaintiffs received." Tr. of Oral Argument dated Jan. 29, 2025, ECF No. 43 at 31:14–16. That amount represents a question of disputed fact, and the Court cannot determine on the record before it that there is no such difference in value.

In light of the foregoing, there remain genuine issues of material fact with respect to multiple elements of the claim for fraud. Accordingly, the plaintiffs' motion for summary judgment granting judgment on their fraud claim is **denied.** Similarly, MFR's motion for summary judgment dismissing the fraud claim is **denied.**

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the plaintiffs' motion for summary judgment is **denied**, and MFR's motion for summary judgment is **granted in part and denied in part.** The Clerk of Court is respectfully directed to close all open motions.[6]

**SO ORDERED.**

**Dated: New York, New York**
**September 11, 2026**

**John G. Koeltl**
**United States District Judge**

[6] The Court has determined that oral argument is unnecessary on these motions.